## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| GUY SCAIFE,<br><br>        *Plaintiff*,<br><br>        v.<br><br>CITY OF MERIDEN,<br><br>        *Defendant*. | No. 3:18-cv-00740 (MPS) |

## RULING ON MOTION FOR SUMMARY JUDGMENT

### I.        INTRODUCTION

Plaintiff, Guy Scaife, brings this suit against Defendant, City of Meriden (the "City"), alleging that the City retaliated against him for speaking out about alleged wrongdoing by terminating his employment as City Manager in violation of Connecticut General Statutes § 31–51q. Plaintiff also alleges that the City breached the covenant of good faith and fair dealing, breached its contractual obligations, and deprived Plaintiff of his property and liberty interests without due process in violation of the 14th Amendment to the United States Constitution. ECF No. 37. The City has filed a motion for summary judgment as to all of Plaintiff's claims. ECF No. 57. For the reasons set forth below, the City's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

### II.        FACTS

The following facts are taken from the parties' Local Rule 56(a) Statements and are undisputed unless otherwise indicated.

Plaintiff was hired as City Manager for the City of Meriden in accordance with a written employment agreement for a three-year term. ECF No. 61-1 at ¶ 1; ECF No. 57-3 at 1-2. The employment agreement provided that "[n]othing in this Agreement shall prevent, limit or otherwise interfere with the right of the Employee to resign at any time from his position with

1

the City, subject only to providing to the City Council written notice of his intention to do so sixty (60) days prior to his effective date of resignation." ECF No. 61-1 at ¶ 2; ECF No. 57-3 at 2. The agreement also provided that "[n]othing in this agreement shall prevent, limit or otherwise interfere with the right of the City Council to terminate the services of the Employee at any time." *Id.* It stated that if Plaintiff was terminated without cause before the end of a three-year term, he would continue to receive salary and benefits for 6 months. *Id.*

The City Charter grants the City Council the power to appoint and remove the City Manager by a majority vote. ECF No 61-1 at ¶¶ 4-5; ECF No. 57-5 at 9, 11. Specifically, the City Charter provides that the City Manager "shall be appointed and may be removed or suspended with or without pay by the City Council. Said appointment, removal or suspension shall be at least by a majority vote of the full membership of the City Council. . . . The [City] Manager may be suspended without or without pay . . . or may be removed by vote of at least the majority of the full membership of the City Council with or without cause." *Id.*

On September 6, 2016, Plaintiff began his employment for the City of Meriden as City Manager. ECF No. 61-1 at ¶¶ 7, 11. Plaintiff's affidavit asserts that in the beginning of 2017, he "discovered a deceptive financial scheme that was unethical and involved significant dollars." ECF No. 61-2 at 7 ¶ 20. He "began reporting the financial improprieties to the City leadership and in discussions with the full Council" and "raised the concerns regarding the financial issues in a formal leadership meeting held on February 16, 2017." ECF No. 61-2 at 19 ¶¶ 77-78. On February 8, 2017, Dennis Waz, the Director of the Public Utilities Department (the "PUD"), wrote a memo to Plaintiff describing these financial improprieties. ECF No. 61-2 at 47. Mr. Waz was concerned "about the amount of funding Public Utilities contributes to the General Fund for in-kind services." *Id.* According to Mr. Waz's calculations, contributions to some departments

were "in excess of 40% and up to 88%." *Id.* That calculation meant, according to Plaintiff, that the "not for profit municipality utility that provides water and sewer services, was paying over 2 million dollars per year for 'in-kind services' from the City, and passing on the cost to its customers, which included not just City of Meriden water and sewer users but also users from neighboring Towns. . . ." ECF No. 61-2 at 7 ¶ 21. According to Plaintiff, the overcharging had been increasing year after year because the City Finance Director, Mike Lupkas, had been "automatically increasing" the cost allocated to the PUD by 3% every year for at least ten years, without any rationale, while the remainder of the town budgets were growing at less than 1% per year during the same ten year period. *Id.* at 7 ¶ 22.

On May 16, 2017, this expense-allocation issue was raised at the Public Utilities Commission meeting. ECF No. 61-2 at 50-52. A motion was made, and unanimously carried, to spend $37,000 on hiring Wright-Pierce, an engineering firm, to perform a forensic study. *Id.* at 51-52. Wright-Pierce produced a draft report in December 2017. ECF No. 61-2 at 54. The draft report concluded, "[i]t appears that the financial support provided by [PUD] is inequitable and for some Departments may be considered excessive." *Id.* at 77. Plaintiff was still employed by the City when the draft report was issued, and he and Mr. Lupkas provided input on the draft to Wright-Pierce in preparation for the final report. ECF No. 61-3 at 20. According to Mr. Waz, the final report was issued in January 2018, after Plaintiff had been terminated. *Id.* at 22.

Plaintiff states that he began reporting these and other financial improprieties to the City leadership in 2016 and the beginning of 2017. ECF No. 61-2 at 19 ¶ 77. For example, according to Plaintiff, he called for an Executive Session on January 17, 2017 during which extensive discussions occurred; he raised concerns during a formal leadership meeting attended by, among others, Mr. Lupkas and Miguel Castro, a member of the City Council and the chairman of the

City Finance Committee, on February 16, 2017; he attempted to present his budget proposal on April 28, 2017 but was blocked by Mr. Castro; and he expressed concerns in correspondence to leadership dated May 24 and 27, 2017. *Id.* at 19-20 ¶¶ 77, 78, 80, 84.

Some of Plaintiff's reports concerned Mr. Castro. Plaintiff alleges that Mr. Castro and Mr. Lupkas worked together on the Finance Committee and that Mr. Castro was a "supporter" of Mr. Lupkas. On April 27, 2017, Plaintiff emailed Mr. Castro a powerpoint presentation for an upcoming City finance meeting that included "numerous reductions in expenses." ECF No. 61-2 at 129. Mr. Castro responded to Plaintiff via email requesting that he "hold off on the powerpoint presentation since we didn't add a presentation on the agenda." *Id.* at 128. Lori Canney, the Council Clerk, replied to Mr. Castro stating that she "never list[s] powerpoint presentations on the [Finance] agendas," to which Mr. Castro responded, "Thank yo[u] for the clarification." *Id.* at 19 ¶¶ 81, 128.

On May 24 and May 27, 2017, Plaintiff emailed Council Majority Leader Brian Daniels, Council Minority Leader Daniel Brunet, as well as Mayor Kevin Scarpati expressing concern over Mr. Castro's tabling of a Capital Improvement Program ("CIP") resolution Plaintiff had submitted for funding projects. ECF No. 61-2 at 20 ¶¶ 82 & 84, pp. 133 & 136. Plaintiff wrote, "I am formally requesting something tangible be done to resolve this problem." *Id.* at 133. Mayor Scarpati replied that he was "appalled by what took place . . . and fe[lt] that if decisions [were] made going into a meeting regarding a given item, they should be properly vetted and discussed before tabling." *Id.* at 141. Mr. Brunet reiterated Mayor Scarpati's concerns via email stating, "This was an important component of the budget that had no rationale for immediate tabling." *Id.* at 139.

Other reports involved Mr. Lupkas and lawyers in the City's Legal Department, Michael Quinn and Deborah Moore. On July 8, 2017, Plaintiff gave Mr. Lupkas an annual performance evaluation and placed him on a performance plan, highlighting that his "lack of focus in certain areas was resulting in 'unnecessary cost to the taxpayers,'" according to Plaintiff. ECF No. 61-2 at 25 ¶ 111. Plaintiff also asserts that on August 21, 2017, he recommended Mr. Lupkas' removal to the HR Director and Council Leadership. *Id.* at 25 ¶ 113. According to Plaintiff, he "raised concerns regarding the unethical conduct of Attorneys Quinn and Moore throughout the summer and fall of 2017 to the Council Members." *Id.* at 38 ¶ 179.

In June 2017, the City Council began a performance evaluation of Plaintiff's first year of employment. ECF No. 61-1 at ¶ 8. The process included asking department heads and Council Members to complete anonymous evaluations. *Id.;* ECF No. 57-6 at 18-20; ECF No. 57-7 at 8. Council Members and Mayor Scarpati had access to an electronic evaluation through the platform "Survey Monkey" that they could submit electronically or print and submit. ECF No. 57-6 at 18-20; ECF No. 57-7 at 8. The department heads received paper versions. ECF No. 57-6 at 19. According to Plaintiff, "[t]he majority of [his] evaluations were all positive," and he "had a favorable response from those with the largest departments," although, "those involved in the retaliatory process put negative comments in [his] reviews and then leaked them to the press to portray [him] in a negative light." ECF No. 61-2 at 23 ¶ 101.

On October 30, 2017, the City Council convened a regular meeting in which Council Member Daniels, seconded by Council Member Brunet, made a motion to increase Plaintiff's salary by 2% to be retroactive to July 2017. ECF No. 57-10 at 1, 12. Council Member Sonya Jelks spoke at the meeting and stated that "she [was] not for a salary increase." *Id.* at 13. She agreed "that there has been some improvement in some things that are definitely going to be

beneficial to us[,] but she thinks that the majority of the savings and benefit are still to be proven.
. . . He eliminated some job roles and that is concerning to her. . . . [She] hasn't seen any savings
yet and that will be a continuing concern for her. . . . [H]onestly speaking the City Manager's
performance has been a mixed bag. . . .There are still some ongoing concerns [regarding] his
management style and some of the behaviors he has put forth." *Id.* Council Member Castro also
spoke against the salary increase. *Id.* at 13-14. Mr. Castro expressed concerns over the city
budget increase of a little over $2.5 million. *Id.*

Council Members Daniels, Battista, Rich, Brunet, Williams, Shamock, and the Mayor
spoke in favor of the salary increase. *Id.* at 12-15. Council Member Daniels listed several of
Plaintiff's accomplishments, including, but not limited to, resolving an issue with the Humane
Society, accomplishing a mill rate goal, staying on top of the Housing Authority while relocating
tenants, closing old projects and repurposing money, and updating technology. *Id.* at 12-13. Mr.
Daniels also praised Plaintiff for saving the City "something north of a million dollars per year. .
. ." *Id.* at 13. Council Member Cathy Battista stated that she had been hesitating on the issue for
money reasons. *Id.* at 14. She "emphasize[d] that

> she has full confidence in the City Manager that he is going to address those things
> including the recommendations that were made during our Executive Session and she has
> confidence in that but she also wants to make a public statement that she is also strongly
> supportive of our staff and our staff's concerns. City staff has gone through a big change
> in the past year and it has been difficult for some and everyone has their opinions and
> thoughts like that. This is not the place for any conversation and it has been a difficult
> time for everyone but she is [in] favor of [the salary increase] because she can
> specifically point to things that the City Manager has done, that she has seen, that she has
> worked with him on and she appreciates that."

*Id.*

The motion for salary increase passed 9:2 with Ms. Jelks and Mr. Castro voting against
the increase. ECF No. 61-1 at ¶ 11; ECF No. 57-9 at 9; ECF No. 57-10 at 15.

On November 3, 2017, Juliet Burdelski, the City's Economic Development director, emailed Plaintiff, Council Member David Lowell, and Deborah Moore, the City Attorney, indicating that she had been contacted by the FBI on October 30, 2017 to request a meeting "to discuss an ongoing investigation into the City Manager [Plaintiff]." ECF No. 61-1 at ¶ 16; ECF No. 57-12 at 5; ECF No. 61-2 at ¶ 40. She also raised concerns that Plaintiff had been "engaging in low level retaliation" against her, explained she did not think that a meeting to discuss the situation would be productive, and submitted her resignation. ECF No. 57-12 at 5.

In early December 2017, Mr. Lowell, who was then Council Majority Leader, contacted City Corporation Counsel, Michael Quinn, regarding Plaintiff's termination. ECF No. 61-1 at ¶ 28; ECF No. 57-13 at 5. Attorney Quinn testified that Mr. Lowell asked him to prepare a synopsis of employee concerns regarding Plaintiff, prior to the majority party's submission of a resolution to terminate Plaintiff's employment. ECF No. 61-1 at ¶ 29; ECF No. 57-13 at 10. He prepared the synopsis, but when Mr. Lowell indicated that he was in favor of termination, Attorney Quinn became concerned about "claims that would be raised" regarding his own impartiality and suggested Mr. Lowell work with outside counsel on the issue. ECF No. 57-13 at 7. Attorney Floyd Dugas from Berchem Moses was retained and most of the discussions regarding termination took place between Mr. Lowell and Attorney Dugas. *Id.* at 7-8.

Attorney Quinn also testified about employee complaints regarding Plaintiff that he had investigated in January 2017—"the CIRMA matter." ECF No. 61-5 at 5-6. In either December 2016 or January 2017, Ms. Burdelski and Wilma Petro, the City's purchasing agent, had raised concerns with Attorney Quinn about the process by which CIRMA, a third-party administrator for workers' compensation claims, had been awarded a City contract. ECF No. 67-3 at 5-7; ECF No. 61-2 at 13 ¶ 44. Attorney Quinn had believed that Ms. Burdelski "felt that there might be a

quid pro quo going on between CIRMA and [Plaintiff] as she was brought into the meeting to discuss availability of sufficient office space for CIRMA within the City of Meriden." *Id.* at 5. Attorney Quinn did an initial investigation into Ms. Petro's concerns and concluded "there wasn't anything that [he] thought had happened that was wrong[.]" ECF No. 61-5 at 6.

Towards the end of the summer of 2017, Council Members Daniels, Lowell, and Battista asked Attorney Quinn to look into the CIRMA issue again, in further depth. ECF No. 61-5 at 4-5. Outside counsel, Berchem Moses, was hired to look at it so that Attorney Quinn's "own role would not be questioned if a decision was reached that someone didn't like." ECF No. 67-3 at 8. According to Attorney Quinn, Berchem Moses "ultimately reached a similar conclusion that [he] reached," which was that although the concerns had merit, he "did not think they rose to the level of needing to do anything further." ECF No. 61-5 at 3; ECF No. 67-3 at 6. The outside investigation cost the City $19,057. ECF No. 61-5 at 3. On November 28, 2017, according to Plaintiff, he "wrote to City Council and the Mayor recommending that Attorney Quinn not be re-appointed a[s] Corporation Counsel." *Id.* at ¶ 180.

On December 8, 2017, Ms. Petro emailed Attorneys Moore and Quinn stating, "I have been made aware that the [Plaintiff] is interested in having me fired. I am alleging retaliation as I believe that this is because he is aware that I am a 'whistle blower' and formally complained in January that he had been behaving unethically on numerous occasions." ECF No. 57-15 at 5. Plaintiff responded via email to Attorney Moore and requested a copy of the formal complaint. *Id.* at 3. Attorney Moore replied that all she had was the email, but that she suspected Ms. Petro had been referencing the CIRMA investigation. *Id.* at 2.

On December 4, 2017, David Lowell was sworn in as the Majority Leader, replacing Mr. Daniels. ECF No. 61-2 at 156. The next day, December 5, 2017, Plaintiff emailed Mr. Lowell

about "[a]n important personnel related item" and attached an email exchange between himself

and Mr. Daniels that had taken place on November 26 and 27, 2017. *Id.* In his email, Plaintiff

requested that City Council consider his "Termination Recommendation" letter from late August,

as well as performance issues involving "the leadership within the Legal Department." *Id.* 156-

57.[1]

Other reports by Plaintiff concerned Council Member Jelks. On December 13, 2017,

Plaintiff emailed Council Member Lowell reporting that Ms. Jelks "has been blind copying

communications with him and different council members to the Record Journal." ECF No. 57-6

at 9-10; ECF No. 57-9 15-16; ECF No. 57-21 at 1. The email states that there had been a

continuous leak of information to the Record Journal and so it had been "obvious from the

beginning that one or more Council members were a significant source of the leaks." *Id.* Plaintiff

had requested the IT director to perform an email server search and the search produced three

emails that Council Member Jelks had forwarded using the blind copy function so that the other

individuals included on the chain would not be aware of the Record Journal's inclusion and so

that any "reply all" responses would automatically be sent to the Record Journal. *Id.* On

December 15, 2017, Plaintiff reported that Council Member Jelks had also blind copied emails to

the NAACP, an action that Plaintiff regarded as a violation of the City's Code of Ethics. ECF

No. 61-1 ¶ 51; ECF No. 57-4 at 29; ECF No. 57-4 at 12; ECF No. 57-22 at 1.

---

[1] The email does not name Mr. Lupkas explicitly, but the sequence of events as set forth
in Plaintiff's affidavit connects the "Termination Recommendation" letter to Plaintiff's
recommendation for Mr. Lupkas' removal on August 21, 2017. ECF No. 61-2 at 25-26 ¶ 113,
119. The email also does not name Attorney Quinn, but Plaintiff's affidavit connects "leadership
within the Legal Department" to Attorneys Quinn and Moore. *See Id.* at ¶¶ 40, 89, 92, 175, 179,
180.

Ms. Jelks, an NAACP member "informally," testified about blind copying Jason Teal at the NAACP from her personal email on a communication dated October 23 in which they discussed HR Manager questions. ECF No. 67-2 at 6, 8. Marci Noguiera had been hired as the HR manager in January 2017 and reported to Plaintiff. ECF No. 61-10 at 1; ECF 67-2 at 5. According to Ms. Jelks, the NAACP had "requested a meeting, they asked us to negotiate a meeting with Marci or with the city manager, which we did, and these were the questions they wanted us to ask." ECF No. 61-7 at 5, 8; ECF No. 67-2 at 6-7.

Ms. Nogueira stated in her affidavit that the NAACP made inquiries "that were focused on [her] activities as the head of HR and [her] qualifications. . . . Having worked in the HR field for many years, [she] had prior dealings with the NAACP. However, this meeting with the NAACP was different. The questioning by the NAACP did not have a neutral tone. The meeting started in an accusatory tone as if [she] had done something wrong and had to defend [her]self." ECF No. 61-10 at 3.

On December 14, 2017, Council Member Lowell notified Plaintiff that there would be a resolution on the agenda for the meeting the following Monday, December 18, 2017, to terminate his employment. ECF No. 61-1 at ¶ 32. On December 15, 2017, the agenda for the December 18 meeting was posted, listing the resolution to terminate Plaintiff. ECF No. 61-1 at ¶ 33; ECF No. 57-16 at 2. All twelve Council Members, namely Battista, Brunet, Carabetta, Cardona, Castro, Daniels, Fontanella, Graham, Jelks, Lowell, Rich, Shamock, and Williams, attended the public meeting held on December 18, 2017. ECF No. 61-1 at ¶ 34; ECF No. 57-17 at 1.

At the public meeting, Council Members Lowell and Cardona presented Item 15, the resolution to terminate Plaintiff "without cause before the end of the three (3) year term provided

that the City pays the [Plaintiff] his annual salary plus benefits for six (6) months after notice of termination." ECF No. 57-17 at 10. During discussion on Item 15, Council Member Lowell stated that there had been "escalating discord in and around City Hall," that the discord "was not a surprise to [Plaintiff]," and that "the escalating discord [was] not a surprise to the Mayor . . . [or] to the Minority Leader or his caucus as he has been in previous Executive Sessions, Council meetings and has been included in communications between or about City Staff and the [Plaintiff]." *Id.* at 10-11. He said the termination was not about "any one event or situation. . . . [or] any one employee or department head interaction or any one disagreement with the [Plaintiff]." *Id.* at 11. "This is about[,] as evidenced by tonight's agenda[,] this entire body of twelve council members who have expressed concern with the escalating discord." *Id.*

Council Member Williams spoke and asked why the termination was done in secrecy. *Id.* at 13.

> I mean, we had, and when I say we, I'm referring to the Mayor, myself, Councilor Shamock, Councilor Brunet, we didn't learn about this literally until the 12th hour. We had no idea that this was even on the radar screen. Is there a reason why this wasn't brought to the Minority Leader's attention so we could have a dialogue and better understand maybe the grounds for termination, which quite frankly, I don't agree with.

*Id.* at 12-13.

A lengthy discussion ensued in which several Council Members spoke on a variety of issues including the 2% raise that Plaintiff had received on October 30, 2017, the CIRMA issue, the FBI investigation, and the payment of six months' salary plus benefits due to Plaintiff as a result of terminating his employment without cause. *Id.* at 12-24. Plaintiff spoke about his impression of the events that took place leading up to the Council meeting and his plans moving forward, should he be retained as the City Manager. *Id.* at 24-25. Specifically, he said,

> I have also found and reported to you ethical violations, intentional efforts to do severe damage to my professional reputation. My blowing the whistle on these wrong doings by

11

senior staff and Councilors has resulted in numerous retaliatory acts starting back a year
ago and it has gone through and to include this resolution of termination planned for
tonight. . . . [W]e really ought to step back and think about what wasn't done when I first
started complaining, first verbally and then began putting it in writing as late as last
November of acts by senior staff as well as Councilmembers that were doing things in
conjunction with.

*Id.* at 25.

Plaintiff stated that if the termination resolution failed, he would "proceed with the

disciplinary actions [he] requested on the Finance Director [Mr. Lupkas] . . . continue to blow the

whistle on those wrong doings, whether it be staff or Council members . . . and file[] [an] official

ethics complaint . . . on actions by some Council members." *Id.* at 25-26. Eight Council

Members voted to terminate Plaintiff's employment and the four other members left the meeting

and were not present for the vote. *Id.* at 27. The motion to terminate Plaintiff without cause

effective immediately carried 8:0. *Id.*

On December 19, 2017, the day after Plaintiff's termination, Cheryl Costello, who was

hired in November, 2016 by Plaintiff for the position of Communications Manager, received a

note slipped under her office door that said "You Two Are Next To Go," with a smiley face

drawn on each side of the text. ECF No. 61-13 at 1, 3; ECF No. 61-2 at ¶ 142. At the time, Ms.

Costello shared an office space with the Director of IT and Facilities, Russ Ford, another

individual hired by Plaintiff. ECF No. 61-13 at 1; ECF No. 61-2 at ¶ 142. Ms. Costello stated in

her affidavit that "[i]t was obvious that the note was directed to him and me." *Id.* Ms. Battista

admitted during her deposition that she had had a conversation with Doreen Roddy, an assistant

in the City manager's office, in which Ms. Battista said something to the effect of "Two down,

two to go." ECF No. 61-4 at 26, 31-32.

The City provided Plaintiff with healthcare, disability, and life insurance benefits for six

months following the termination and Plaintiff kept his City issued phone until June 2018. ECF

No. 61-1 at ¶¶ 40-41. In October 2018, Plaintiff obtained a supervisor position with the Dead River Company. *Id.* at ¶ 43. On January 16, 2020 Plaintiff was slated to start working as the Interim Town Manager in Thetford, Vermont. *Id.* at ¶ 44.

Although  the parties are in general agreement about the sequence of events, Plaintiff casts them as motivated by retaliation for his reporting of alleged wrongdoing and by a desire to cover up that wrongdoing. ECF No. 61 at 13. The City does not dispute that Plaintiff raised concerns and issues regarding Mr. Lupkas, Mr. Castro, Mr. Quinn, and Ms. Jelks. ECF No. 61-1 at ¶¶ 55, 59, 70, 74, 80. It argues, however, that Plaintiff's raising of those concerns had no influence on the Council Members' decision to terminate Plaintiff. *Id.* Instead, the City maintains that Plaintiff's termination was a direct result of the growing discord between Plaintiff and City employees. ECF No. 57 at 17.

The City has submitted evidence, which Plaintiff disputes, that Council Members Lowell, Daniels, Battista, Jelks, Cardona, and Graham voted to terminate Plaintiff due to the discord between Plaintiff and City staff and the low morale of City employees. *See* ECF Nos. 57-6 at 20-21 (In response to attorney question—"that's the reason for the discharge then, discord?" Mr. Lowell responded "Yes."); 57-8 at 3 ¶ 25 (Mr. Daniels submitted a declaration stating "I voted to terminate [Plaintiff] . . . based on the strong sense that I had that the business of the City was grinding to a halt due to the enormous amount of friction between [Plaintiff] and a growing segment of City employees."); ECF No. 57-7 at 22-23 (Ms. Battista testified "It's always been how [Plaintiff] behaved and spoke to city staff, not whether he was right or wrong. He may have been right, but it was his delivery. It was how he did things that was intimidating and broke morale."); ECF No. 57-9 at 17-18 (Ms. Jelks testified that the reason for her vote to terminate was "[a] number of things," but that the "primary reason was the business of the city was not

being conducted and the environment."); ECF No. 57-11 at 2 (Mr. Cardona submitted a declaration in which he stated "I voted to terminate [Plaintiff] due to my opinion of the manner in which he acted with staff and the public and the growing tension with City staff."); ECF No. 57-23 at 1 ¶¶ 7, 10 (Mr. Graham submitted a declaration in which he stated that his "decision to terminate [Plaintiff] was because [he] believed the morale of the City employees was at an all-time low and [he] sensed that the City would lose good employees."). The City also offers evidence that Council Member Fontanella voted to terminate Plaintiff's employment because the majority leader, Mr. Lowell, asked him to and because he respected Mr. Lowell's opinion. *Id.* at ¶ 82; *see also* ECF No. 57-14 at ¶¶ 6, 7 (Mr. Fontanella submitted a declaration in which he stated that "[t]he majority leader, David Lowell, asked that I support the termination of [Plaintiff]. . . . I voted for the termination as I respect the opinion of Mr. Lowell and he requested my support of the resolution of termination.").

Plaintiff argues that those stated reasons are pretextual and that the discord was "manufactured." ECF No. 61-1 at ¶¶ 14, 56. He asserts that the Council Members "made the decision to terminate because they knew that the scheme of overcharging PUD was about to come to an end. They rushed the termination resolution once the PUD study was released and the ethics issues of Mr. Castro and Jelks were raised. Plaintiff uncovered financial improprieties and one of them was about to cause a huge budget deficit that they would be forced to address." ECF No. 61-1 at ¶ 56; *see also* Plaintiff's denials at ¶¶ 56, 60, 63, 67, 71, 75, 81. According to Plaintiff, the majority party rushed to terminate him within days of his report to the Council that Ms. Jelks had violated the City's Ethics Policy by blind copying the Record Journal and NAACP on private emails, ECF No. 57-22 at 1; ECF No. 61 at 11-12, and within days of his report that Mr. Castro had also committed an ethics violation. ECF No. 61 at 11.

14

According to Plaintiff, Wright-Pierce completed its draft PUD report in the first week of December, and on December 11, 2017 he, Mr. Lupkas, and Mr. Waz met with Wright-Pierce to review the findings. ECF No. 61-2 at 9-10 ¶¶ 31-32. The draft report "showed an annual over allocation to the PUD in excess of $871,000." *Id.* at 10 ¶ 32, p. 80.[2] Plaintiff asserts that at that meeting, he "made it clear" that he "intended to present the study and findings to the City Council and the new budget would reflect the correct allocation to the [PUD]. The final report was to be sent to [the City] by January."  ECF No. 61-2 at 10 ¶ 32. Plaintiff does not assert that he discussed the draft report with Council Members, but argues that "it was obvious to everyone that [he] would implement the findings of the study." ECF No. 61 at 10. During this period, according to Plaintiff, Plaintiff was pressing for Mr. Lupkas to be terminated, but the Majority Council Members needed Mr. Lupkas to avoid implementation of the PUD study, which would create a budget deficit—a situation that would not be in the best interest of the majority party since addressing it would require cuts or tax increases. ECF No. 61-1 at ¶ 14; ECF No. 61-2 at 10 ¶ 33.

Another motivation for retaliation, according to Plaintiff, was the ethical concern Plaintiff had raised regarding Mr. Castro. ECF No. 61-1 at ¶ 5. Plaintiff asserts that he had received a complaint in the first week of December 2017 from the Neighborhood Association that Mr. Castro had "threatened to take away City funding from the President of the Neighborhood Association unless the Association President removed an individual, who had been Mr. Castro's political opponent, from a leadership role at the Association." ECF No. 61-2 at 28 ¶ 131.

---

[2] Plaintiff apparently arrives at the $871,000 calculation by subtracting the proposed PUD contribution to the budget ($1,066,418) from the current PUD contribution to the budget ($1,938,141). ECF No. 61-2 at 80.

Plaintiff avers that he reported the matter to the Council leadership on December 11, 2017 and stated that "[Mr.] Castro's actions were a clear ethics violation and action must be taken." *Id.*

## III.    LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted).  In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## IV.    DISCUSSION

### A.    Retaliation (Count One)

Plaintiff alleges that the City retaliated against him in violation of Connecticut General Statutes § 31–51q.[3] Section 31–51q "prohibits employers from disciplining or discharging

---

[3] Conn. Gen. Stat. § 31–51q provides in relevant part: "Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first

employees in retaliation for exercising their right to free speech." *O'Connor v. Pierson*, 568 F.3d 64, 67 (2d Cir. 2009); *see also D'Angelo v. McGoldrick*, 685 A.2d 319, 320 (Conn. 1996) ("General Statutes § 31–51q provides a cause of action for damages for an employee who has been disciplined or discharged on account of the exercise by such employee of various constitutional rights including the freedom of speech.").

"To make out a prima facie § 31–51q claim against the City, [Plaintiff] must show that (1) the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest; (2) he suffered an adverse employment action; and (3) the speech was at least a substantial or motivating factor in the adverse employment action." *Lynch v. Ackley*, 2012 WL 6553649 *8 (D. Conn. Dec. 14, 2012). The third element, causation, can be established "directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (citation omitted*); see also Ayantola v. Bd. of Trustees of Technical Colleges*, 976 A.2d 784, 790 (Conn. App. 2009) (explaining that retaliatory causation can be established indirectly by evidence of temporal proximity or directly by evidence of retaliatory animus). "[C]onclusory assertions of retaliatory motive" are insufficient. *Smith*, 776 F.3d at 118.

If Plaintiff satisfies his burden on the elements of a prima facie case, the "defendant may avoid liability by showing, by a preponderance of the evidence, that it would have taken the

---

amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages...."

same adverse employment action even in the absence of protected speech." *Karagozian v. Luxottica Retail North America*, 147 F. Supp.3d 23, 31 (D. Conn. 2015); *see also Matusick v. Erie County Water Authority*, 757 F.3d 31, 47 (2d Cir. 2014) (noting, in context of Section 1983 First Amendment retaliation claim that "[s]hould a plaintiff demonstrate [the prima facie] factors, the defendant has the opportunity to demonstrate by a preponderance of the evidence that it would have undertaken the same adverse employment action even in the absence of the protected conduct.  The plaintiff may prevail on his [retaliation] claim if he can show that the defendants would not have implemented the same adverse employment actions were it not for their discriminatory motivations.") (citation omitted); *Mt. Healthy City Sch. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286-87 (1977) (if plaintiff carries its prima facie burden, defendant can then show "that it would have reached the same decision as to [termination] even in the absence of the protected conduct.").

The City does not dispute, for the purposes of this motion, that Plaintiff engaged in protected conduct or that Plaintiff suffered the adverse action of termination. ECF No. 67 at 5. The City argues, however, that Plaintiff has "failed to present evidence sufficient to establish a causal connection between his termination" and the protected speech. *Id.* The City also argues that it would have terminated Plaintiff even in the absence of the protected speech. ECF No. 57-1 at 16.

After considering the evidence in the record in the light most favorable to Plaintiff, I conclude that Plaintiff and the City have both presented evidence to support their theories as to the motivation behind Plaintiff's termination such that the issue cannot be decided as a matter of law, but must be reserved for a jury. A reasonable jury could credit the testimony of the Council Members and find that the City fired Plaintiff due to the growing discord between Plaintiff and

City employees. ECF Nos. 57-6 at 20-21; 57-8 at 3 ¶ 25; 57-7 at 22-23; 57-9 at 17-18; ECF No. 57-11 at 2; ECF No. 57-23 at 1 ¶¶ 7, 10; ECF No. 57-14 at ¶¶ 6, 7. On the other hand, a reasonable jury could credit Plaintiff's evidence that the claim of "discord" was a pretext and the true motivation was retaliation for Plaintiff's reports about financial improprieties and ethical violations.

Plaintiff offers the following evidence from which a reasonable juror could find that his termination was substantially motivated by his reporting of financial and ethical issues. Three days before his termination, Plaintiff reported to the Council majority leader that Council Member Jelks was blind copying the NAACP and the Record Journal on emails, actions that Plaintiff considered violations of the City's ethical code. ECF No. 61-1 ¶ 51; ECF No. 57-4 at 29; ECF No. 57-4 at 12; ECF No. 57-22 at 1. Seven days before his termination, Plaintiff reported Mr. Castro's alleged ethical violation to the Council leadership. ECF No. 61-2 at 27-28 ¶ 131. He also followed up at that time on the legal department issues, inquiring if anything would be done regarding his recommendation that Attorney Quinn not be re-appointed. ECF No. 61-2 at 39 ¶ 180. Thirteen days before his termination, he followed up with the new Council majority leader on his recommendation that Mr. Lupkas be terminated. ECF No. 61-2 156-57. From the temporal proximity of these reports, a reasonable juror could find that the Council voted to terminate Plaintiff out of retaliation.

Plaintiff also points to the similarity between a note slipped under the door of a City employee, the day after Plaintiff was terminated, and Council Member Battista's statement to Ms. Roddy—both relaying the same message "Two down, two to go." ECF No. 61-4 at 31-32. A reasonable jury could find from this evidence that Ms. Battista and others acting with her were motivated to terminate Plaintiff out of retaliatory animus.

The parties have offered evidence that tells two different versions of a story about what caused the City to terminate Plaintiff's employment, rendering the question as to which version to credit one of credibility that only a jury may answer. *See Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.") (citation and internal quotation marks omitted); *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996) (explaining that the "court should not weigh evidence or assess the credibility of witnesses" when applying the summary judgment standard. "Th[ose] determinations are within the sole province of the jury.") (citations omitted).

Further, the same evidence raises a genuine factual dispute about whether the City would have taken the same adverse employment action even in the absence of the protected speech. The record raises an inference that the City would not have terminated Plaintiff if he had not reported financial and ethical violations. Plaintiff received a 2% raise at the October 30th meeting in which several Council Members as well as the Mayor spoke about benefits and improvements Plaintiff had provided as City Manager. ECF No. 57-10 at 12-15. As of that time, there was evidence that the majority of Council Members supported Plaintiff. But just over a month later, beginning in early December, Plaintiff made the above-mentioned reports – including reports raising ethical concerns about Ms. Jelks and Mr. Castro – and, within days, the Council Members voted to terminate him. This is enough to allow a reasonable juror to conclude that he would not have been terminated but for his reports.  Only a jury can decide whether the Council was acting out of retaliatory animus or out of a desire to remove a source of discord among City employees. *See Smith*, 776 F.3d at 125 ("[S]ummary judgment is precluded where questions regarding an

employer's motive predominate the inquiry regarding how important a role the protected speech played in the adverse employment decision.") (citation omitted).

I therefore deny summary judgment as to Count One.

## B.      Breach of Implied Covenant of Good Faith and Fair Dealing (Count Two)

Implicit in every contract is a duty of good faith and fair dealing that neither party will do anything that will injure the right of the other party to receive the benefit of the agreement. *See Capstone Bldg. Corp. v. Am. Motorist Ins. Co.*, 67 A.3d 961, 986 (Conn. 2013) ("[I]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . . In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . ." (internal quotation marks omitted)). The essence of the good faith and fair dealing principle "is the fulfillment of the reasonable expectations of the parties." *Magnan v. Anaconda Indus., Inc.*, 479 A.2d 781, 789 (Conn. 1984).

The principle is not generally applicable to termination claims in the context of an at-will employment contract. *See id.* at 788 (declining "to transform the requirement of good faith into an implied condition that an employee may be dismissed only for good cause."). "Where employment is clearly terminable at will, a party cannot ordinarily be deemed to lack good faith in exercising this contractual right." *Id.* at 789; *see also Geysen v. Securitas Sec. Serv. USA, Inc.*, 142 A.3d 227, 241 (Conn. 2016) ("A covenant of good faith should not be implied as a modification of an employer's right to terminate an at-will employee because even a whimsical termination does not deprive the employee of benefits expected in return for the employee's performance. This is so because performance and the distribution of benefits occur simultaneously, and neither party is left high and dry by the termination.").

An exception to that rule exists when the termination of an at-will employee violates some important public policy. *See McKinstry v. Sheriden Woods Health Care Center, Inc.*, 994 F. Supp. 2d 259, 267 (D. Conn. 2014) ("In order to state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege 'a demonstrably improper reason for dismissal, a reason whose impropriety is derived from some important violation of public policy.'") *quoting Morris v. Hartford Courant Co.*, 513 A.2d 66, 67 (Conn. 1986) (emphasis omitted).  But the exception is narrow and does not apply if an adequate statutory remedy exists by which the public policy violation can be enforced. *See Burnham v. Karl and Gelb, P.C.*, 745 A.2d 178, 181 (Conn. 2000) (concluding plaintiff was precluded from bringing a wrongful discharge claim based on violation of a public policy because, among other things, the existence of a statutory remedy under Conn. Gen. Stat. § 31-51m(c) precluded plaintiff's claim); *see also McKinstry*, 994 F. Supp. 2d at 267 (plaintiff's claim for breach of the implied covenant of good faith and fair dealing based on age discrimination precluded by Connecticut's Fair Employment Practices Act: "Connecticut courts preclude claims for breach of the implied covenant of good faith and fair dealing where there are adequate statutory remedies through which the alleged public policy violations can be enforced." (internal quotation marks and alteration omitted)); *Leichter v. Lebanon Bd. of Educ.*, 917 F. Supp. 2d 177, 194-195 (D. Conn. 2013) (citing cases).

In this case, Plaintiff has failed to raise a genuine issue of material fact demonstrating that the City breached an implied duty of good faith and fair dealing when it terminated his employment without cause. Plaintiff entered into an employment agreement with the City that provided for termination without cause – an at-will relationship. *See Thibodeau v. Design Group One Architects, LLC*, 802 A.2d 731, 735 (Conn. 2002) ("In Connecticut, an employer and employee have an at-will employment relationship in the absence of a contract to the contrary.

Employment at will grants both parties the right to terminate the relationship for any reason, or

no reason, at any time without fear of legal liability."); *see also Taravella v. Wolcott*, 599 F.3d

129, 134 (2d Cir. 2010 ("Under Connecticut law, employment is at-will by default, and parties

must specifically contract a right to be terminated only for cause.") (citation omitted). Plaintiff's

employment agreement expressly provides that "[n]othing in this agreement shall prevent, limit,

or otherwise interfere with the right of City Council to terminate the services of the Employee at

any time." ECF No. 57-3 at 2. Plaintiff and the City appear to agree that the City Charter, at least

to some extent, also governs the administration of Plaintiff's employment agreement. *See* ECF

Nos. 57-1 at 1-2, 61 at 32. Plaintiff asserts that the agreement references the City Charter, and

that the Charter has "specific rules on how the [C]ouncil can conduct City business" that it must

follow to terminate Plaintiff.  ECF No. 61 at 32. Specifically, Plaintiff points out that the Charter

may terminate the City Manager only by majority vote of the City Council. Plaintiff argues that

this requirement made Plaintiff "not simply an at-will employee" and that the City violated this

requirement by terminating him at the instigation of the majority Council members, who had met

previously and "decided in 'caucus' to terminate Plaintiff's employment." *Id.* at 32, 30.

This argument fails for two reasons. First, although the agreement references the

Charter, both the Charter and the agreement make clear that the City may terminate Plaintiff

without cause upon a majority vote of the Council, which is undisputedly what happened on

December 18, 2017. ECF No. 57-17 at 10. Second, no reasonable juror could find that the City

violated the Charter simply because the Council members in the majority party caucused before

the Council meeting at which the vote was to be taken and decided how they would exercise

their votes. Nothing in the Charter prohibits such conduct, and it is, as the City notes, "how

government works." ECF No. 67 at 11.

23

When it terminated Plaintiff's employment, the City was exercising its contractual right, an action not deemed to be in bad faith unless Plaintiff can show a violation of an important public policy. *Magnan,* 479 A.2d at 789; *Morris,* 513 A.2d at 67. Apart from the statutory remedy under § 31–51q, Plaintiff does not allege that the City violated a public policy. Instead, Plaintiff points to specific conduct, including that the City "attempted by bully Plaintiff," threatened Plaintiff induce him to sign a release of his legal rights against the City, left harassing notes for individuals he had hired, instigated the CIRMA investigation for the purpose of manufacturing a negative narrative, and held an illegal meeting to make a termination decision. ECF No. 61 at 29. Those allegations are, in essence, allegations of retaliation against him for his speech while employed as City Manager – conduct for which Plaintiff already has a statutory remedy under § 31–51q. Plaintiff is thus precluded from bringing his claim for breach of the covenant of good faith and fair dealing. *Burnham,* 745 A.2d at 181. I therefore grant the City's motion for summary judgment as to Count Two.

### C.      Breach of Contract (Count Three)

"The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages*." Meyers v. Livingston, Adler, Pulda, Meiklejohn and Kelly, P.C.*, 87 A.3d 534, 540 (Conn. 2014). Plaintiff's claim for breach of contract fails as a matter of law because the employment agreement between Plaintiff and the City expressly permitted termination without cause. As I have previously described, the agreement granted both parties the right to terminate the relationship without cause, at any time, for any reason, or for no reason. ECF No. 57-3 at 2. Consequently, the City had the right to terminate Plaintiff's at-will employment and no breach occurred when it exercised that right. *Thibodeau,* 802 A.2d at 735.

24

Plaintiff makes the same argument about the City's alleged violation of "procedural rules" in the Charter described above, i.e., he argues that the City breached the agreement because members of the majority party on the Council decided to terminate him before the December 18th Council meeting, which was contrary to the Charter provision vesting the right to terminate the City Manager in the Council as a whole. I reject this argument for the same reasons set forth above. Plaintiff has not offered evidence sufficient to create a genuine dispute of material fact that would show that the City breached the employment agreement. I therefore grant summary judgment as to Count Three.

### D.      Deprivation of Property Interest (Count Four)

Plaintiff argues that the City Charter rules governing his termination created a constitutionally protected property interest in his employment, such that he was entitled to some form of pre-termination hearing under the Due Process Clause of the Fourteenth Amendment. ECF No. 61 at 36-37. This claim fails too, however, because the only "rule" in the Charter limiting the City's ability to terminate the Plaintiff's employment without cause was the requirement of a majority vote of the Council, and that requirement did not create a property interest.

The determination of whether Plaintiff was deprived of property without due process involves a two-step process: First, I must "determine whether some source of law other than the Constitution, such as a state or federal statute, confers a property right on the plaintiff. . . . Once such a property right is found, [I] must determine whether that property right 'constitutes a property interest for purposes of the Fourteenth Amendment.'" *Taravella,* 599 F.3d at 133 (citation omitted). "*If* a protected interest is identified, [I] must then consider whether the [City] deprived the plaintiff of that interest without due process." *Narumanchi v. Bd. of Trustees*, 850

F.2d 70, 72 (1988) (emphasis in original) (citation omitted). A property interest arises for a public employee only if the employee is guaranteed continued employment and the state is barred, "whether by statute or contract, from terminating (or not renewing) the employment relationship *without cause*." *Taravella,* 599 F.3d at 134 (emphasis in original) (citation and quotation marks omitted); *see also Ciambriello v. Nassau*, 292 F.3d 307, 313 (2d Cir. 2002). Here, of course, the contract and the Charter say just the opposite, i.e., that the City may terminate the plaintiff without cause. That the City had to do so by a majority vote of the Council did not create a guarantee of continued employment or any other "legitimate claim of entitlement," *Velez v. Levy*, 401 F.3d 75, 85 (2d Cir. 2005), with respect to job tenure. *See Esposito-Cogan v. East Haven Bd. of Educ.*, 3:07-CV-681, 2009 WL 839015, at *4 (D. Conn. March 30, 2009) (explaining that statutory ninety-day notice merely imposed a notice requirement and "did not confer a vested property interest in [plainitff's] right to renewal of her [employment] contract") *citing Goetz v. Windsor Ctr. Sch. Dist.*, 698 F.2d 606, 609 (2d Cir. 1983) (finding that no property interest arose from provision in collective bargaining agreement requiring employer to give notice and to provide reasons for releasing employee: "The mere fact that an employer may be required to notify an employee of the reasons for discharge does not alter the employee's status[ as an at-will employee].")  In any event, as noted, the City complied with the procedural requirement that it terminate Plaintiff's employment by majority vote of the Council in the December 18, 2017 meeting.  Because no reasonable juror could find that Plaintiff had a legitimate claim of entitlement to continued employment, I grant summary judgment as to the property interest claim.

### E.       Deprivation of Liberty Interest (Count Five)

Plaintiff claims that the City made false statements about him that raised "significant roadblocks in his ability to continue in his profession," thereby depriving him of a liberty interest without due process. ECF No. 61 at 37. It is well established that a "person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983." *Patterson v. City of Utica,* 370 F.3d 322, 329–30 (2d Cir.2004). For a cause of action to arise, the loss of one's reputation must be coupled with a deprivation of a more tangible interest, such as government employment. *Id.* at 330. "For a government employee, a cause of action under § 1983 for deprivation of a liberty interest without due process of law may arise when an alleged government defamation occurs in the course of dismissal from government employment." *Id.* That cause of action is referred to as a "stigma-plus claim." *Segal v. City of New York*, 459 F.3d 207, 212 (2d Cir. 2006) (explaining that a stigma-plus claims involves "injury to one's reputation (the stigma) coupled with the deprivation of some tangible interest or property right (the plus), without adequate process") (citation and quotation marks omitted).

To establish a stigma-plus claim based on a termination from government employment, a plaintiff must satisfy three elements. *Id.*

> First, the plaintiff must ... show that the government made stigmatizing statements about [him]—statements that call into question [the] plaintiff's good name, reputation, honor, or integrity. . . . [S]tatements that denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession will satisfy the stigma requirement. Second, a plaintiff must prove these stigmatizing statements were made public. Third, the plaintiff must show that the stigmatizing statements were made concurrently with, or in close temporal relationship to, the plaintiff's dismissal from government employment."

*Id.* (citations, internal quotation marks, and emphasis omitted).

27

A Plaintiff need not be deprived completely of his ability to practice his profession but must demonstrate that the statements put up significant roadblocks in his ability to practice his profession. "The test of whether a state employer's decision not to rehire an employee denies that employee due process is met when it deprives her of the freedom to take advantage of other employment opportunities." *Donato v. Plainview-Old Bethpage Cen. Sch. Dist.*, 96 F.3d 623, 630 (2d Cir. 1996) (citation and internal quotation marks omitted).

When I construe the facts in the light most favorable to Plaintiff, I find that Plaintiff has raised a genuine issue of material fact as to Count Five. A reasonable jury could find that the statements that Council Members made at the public hearing called into question Plaintiff's reputation and his competence as a professional. For example, Mr. Lowell stated that the termination was about the "entire body of twelve council members who have expressed concern with the escalating discord," and that it was about "an admission from the Minority caucus that they in fact believe there is something within the context of their discussion with the City Manager that should have been toned down." ECF No. 61-2 at 93. After the meeting, the local newspaper, The Record Journal, published an article stating that Plaintiff "was terminated after a party line vote by the City Council in December, with some councilors saying he caused 'discord' in City Hall." ECF No. 61-2 at 204. A reasonable juror could find from this evidence that Council members made statements at the meeting that "denigrate[d Plaintiff's] competence as a professional and impugn[ed his] professional reputation." *Segal*, 459 F.3d at 212.

A reasonable juror could also find that the statements suggesting that Plaintiff was the source of "discord" among City workers was false. Only six weeks before the statements were made, the Council, by a 9:2 vote, agreed to give Plaintiff a substantial raise. And Plaintiff points to statements made by other Council Members that directly contradict Mr. Lowell's statements.

Mr. Williams stated that contrary to Lowell's suggestion, the minority caucus supported Plaintiff. ECF No. 61-2 at 94. Mr. Brunet, another member of the minority caucus, stated that outside of a small group of City employees, Plaintiff "does not have a problem" and that everything he did was met with passive resistance. *Id.* at 96. Plaintiff has submitted sufficient evidence from which a reasonable juror could find that the true reason for terminating him was retaliation and that statements about "discord" were pretexts designed to mask the Council's true motivation.

The record also raises a material question of fact as to whether the comments the Council Members made during the termination put a significant roadblock in Plaintiff's continued ability to practice his profession. *See Donato*, 96 F.3d at 631 (concluding that supervisor's termination implicated a liberty interest because statements and comments about her "reciting a litany of lack of professional competence" were "so harsh as to be likely to persuade any other school board not to hire plaintiff as a supervisor"). As noted, the newspaper article reporting on the comments of Council Members at the December 18, 2017 public meeting suggested that Plaintiff was terminated because he sowed "discord" in City government – a very public job evaluation that could easily erect significant roadblocks to Plaintiff's ability to serve in other senior positions in municipal government. According to Plaintiff, he "has been unable to obtain comparable employment as a Manager for a City since the termination of his employment." ECF No. 61 at 37. He has been hired only on an interim basis for six months in a small town in Vermont, making a fraction of the salary he earned working for the City. *Id.*

Finally, it is undisputed that the statements by Council Member Lowell and others concerning "discord" were made at the same public meeting at which the termination occurred, which is sufficient to satisfy the public element and the temporal proximity element of a stigma

plus claim. ECF No. 57-17 at 1, 27. Because there are triable issues of fact with respect to the liberty interest claim, I deny summary judgment as to Count Five.

**V.      CONCLUSION**

For the reasons set forth above, I hereby GRANT in part Defendant's motion for summary judgment.


IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                October 8, 2020